## THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Case No. |
| PFO GLOBAL, INC. | Chapter 11 |
| Debtor. | |
| In re | Case No. |
| PRO FIT OPTIX HOLDING COMPANY, LLC, | Chapter 11 |
| Debtor. | |
| In re | Case No. |
| PRO FIT OPTIX, INC., | Chapter 11 |
| Debtor. | |
| In re | Case No. |
| PFO TECHNOLOGIES, LLC, | Chapter 11 |
| Debtor. | |
| In re | Case No. |
| PFO OPTIMA, LLC, | Chapter 11 |
| Debtor. | |
| In re | Case No. |
| PFO MCO, LLC | Chapter 11 |
| Debtor. | |

### DECLARATION OF MATT CEVASCO
### IN SUPPORT OF FIRST DAY MOTIONS

Matt Cevasco declares pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the Chief Executive Officer of PFO Global, Inc. ("Global"), which wholly owns its subsidiary, Pro Fit Optix Holding Company, LLC ("Holding"). Holding wholly owns Pro Fit Optix, Inc. ("Optix"), PFO Technologies, LLC ("Technologies"), PFO Optima, LLC ("Optima") and PFO MCO, LLC. ("MCO") (collectively "Debtors" or "PFO Companies").

2.      In my capacity as CEO, I am familiar and knowledgeable about the business, financial affairs, and day-to-day operations of the PFO Companies. I submit this declaration to assist the Court and other parties in interest in understanding the Debtors' businesses and the circumstances that compelled the commencement of these Chapter 11 bankruptcy cases as well as in support of the Debtors' Chapter 11 petitions and the Debtors' motions filed with the Court, including, but not limited to, the first day motions filed contemporaneously with the voluntary petitions.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge, my review of relevant documents, discussions with members of management and employees of the Debtors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial affairs. I am authorized to submit this Declaration, and if called upon to testify, I would testify to the facts set forth herein.

4.      Section I of this Declaration sets forth the historical background of the PFO Companies. Section II describes the business operations of the PFO Companies. Section III sets out the consolidated assets of Global. Section IV describes revenue generation for the PFO Companies. Finally, Section V describes the necessity for the filing of these bankruptcy cases.

## I. BACKGROUND OF PFO COMPANIES

5.      On June 30, 2015 (the "Effective Date"), Holding became a wholly owned subsidiary of Global pursuant to an Agreement and Plan of Merger (the "Merger Agreement") with Global and PFO Acquisition Corp. ("Merger Sub"), another wholly-owned subsidiary of Global (the "Merger").

6.      For accounting purposes, the Merger was recognized in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Subtopic 805-40, "Reverse Acquisitions." Accordingly, Global has been recognized as the accounting acquiree in the Merger, with Holding being the accounting acquirer. As such, the historical financial statements of Holding are treated as the historical financial statements of the combined company.

7.      On the Effective Date, Global had outstanding 23.988 shares (the "Escrow Shares") of Series A Convertible Preferred Stock ("Preferred Stock"). Pursuant to the Merger Agreement, on the Effective Date, the Preferred Stock was amended such that the Escrow Shares became convertible into an aggregate of 2,500,000 shares of common stock at the instruction of the holder. Further, the holder was required to assign the Preferred Stock to be held in escrow by an escrow agent (the "Escrow Agent"). On the Effective Date, Holding, Merger Sub, Global, a third party (the "Account Advisor") and the Escrow Agent entered into an Escrow Agreement (the "Escrow Agreement"), pursuant to which the Escrow Agent agreed to hold the Escrow Shares for release pursuant to written instructions provided from time to time by the Account Advisor. When the Escrow Agreement expired December 31, 2016, any Escrow Shares not released from escrow would be cancelled. As of December 3, 2016, no Escrow Shares had been released by the Escrow Agent.

8. Global, formerly Energy Telecom, Inc., was incorporated in Florida on September 7, 1993 and reincorporated in Nevada on June 2, 2015 pursuant to an agreement and plan of merger between Energy Telecom, Inc. and its wholly owned subsidiary, Energy Telecom Reincorporation Sub, Inc., a Nevada corporation ("ET-NV"), whereby Holding merged with and into ET-NV with ET-NV as the surviving corporation that operates under the name "PFO Global, Inc."

9. Global is registered with the United States Securities and Exchange Commission under Commission File Number 333-167380.

10. Prior to the Merger, Holding's mission was to monetize its global utility patent portfolio with claims covering certain features of intelligent eyewear.

11. Global completed the Merger with Holding on June 30, 2015. Following the Merger, Global began focusing its resources on the manufacturing and distribution of eyewear through proprietary manufacturing, ordering and delivery systems that reduce cost to eyewear providers, through Optix, Holding's wholly-owned subsidiary.

12. Optix, a Wyoming corporation, was incorporated on May 7, 2009. On February 9, 2011, Optix filed a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code. Optix was assigned Case No. 11-13387 in the United States Bankruptcy Court for the Southern District of Florida. On May 2, 2011, Optix filed a Plan of Reorganization (the "Optix Plan of Reorganization") which was approved in August 2011. Pursuant to the Optix Plan of Reorganization, debtor-in-possession financing was provided by HCA DIP Capital Fund, LLC.

13. Holding, a Florida limited liability company, was formed on February 9, 2011. Holding was previously known as HCA DIP Capital Fund, LLC which was formed to provide and did provide debtor-in-possession financing as a lender to Optix. The members of HCA DIP Capital Fund, LLC were majority stockholders of Optix prior to its reorganization.

14. On May 17, 2012, Optix emerged from bankruptcy and, in exchange for the outstanding debtor-in-possession financing, issued all of the outstanding shares of its new common stock to Holding and became a wholly owned subsidiary of Holding.

15. Three additional wholly-owned subsidiaries of Holding, Technologies, Optima, and MCO, were incorporated on February 17, 2014, May 23, 2013 and July 5, 2013, respectively. Each of these entities was organized in the State of Florida.

16. The corporate organization chart thus reflects as follows:



## II. BUSINESS OPERATIONS

17. Global manufactures and delivers complete eyewear, prescription lenses and related services to the managed care insurance industry, which services the Medicaid and Medicare entitlement programs, independent eye care providers and accountable care organizations. Prior to the Merger, Holding's mission was to monetize its global utility patent portfolio with claims covering certain features of intelligent eyewear.

18. Following the Merger, the Global began focusing its resources on the manufacturing and distribution of eyewear through proprietary manufacturing, ordering and

delivery systems that reduce cost to eyewear providers, through Optix. Optima distributes distortion free polycarbonate lenses under the Resolution® brand name. Technologies' focus is on the development of disruptive technologies for the eyewear industry and supports the research and development of other business units of Global.

19.     The developed products currently include:

- SmartCalc - proprietary software used to manufacture fully digital lens designs. Certain Company lenses are produced following the SmartCalc software calculation.

- SmartEyewear Online Ordering System - a business-to-business online ordering software system which allows eye care providers to quickly provide all necessary information for each patient's eyewear package and unique use. It integrates the optical provider directly with the PFO worldwide lab system. The Company utilizes this system for all of its electronic ordering.

20.     Global is headquartered in Farmers Branch, Texas where primarily all corporate functions are performed as well as the support, sales and warehousing for all MCO and Technologies' products and services.

21.     Global utilizes third party frame providers, primarily Hong Kong Optical Lens Co. in Shenzhen, China ("HKO") which sells frames to Global and warehouses them in HKO's facility until such time as the frames are released to designated laboratories to be fit with a lens. HKO is responsible for tracking and managing inventory on behalf of Global from the point of purchase to the shipment of the frames to the laboratories. HKO also processes all of Global's custom prescription eyeglass lens needs. Global also sources frames from other frame manufacturers, including Modern Optical and Eight to Eighty, although HKO provides the majority of its supply.

### III. GLOBAL'S CONSOLIDATED ASSETS

22.     **Cash.**  Global maintains its cash and cash equivalents with financial institutions. As of the morning of January 30, 2017, Global had cash of $98,581.84.

23.     **Accounts Receivable.**  Global does business and extends credit based on an

evaluation of its customers' financial condition, generally without requiring collateral. Exposure to losses on receivables is expected to vary by customer due to the financial condition of each customer. Global monitors exposure to credit losses and maintains allowances for anticipated losses considered necessary under the circumstances. Global's allowance for doubtful accounts was approximately $248,500 at September 30, 2016. On the Petition Date, the PFO Companies' accounts receivable totaled approximately $350,000.

24. **Inventory.** Inventory is comprised of finished goods, frame and lens inventory. In assessing the value of inventories, Global makes estimates and judgments regarding aging of inventories and other relevant issues potentially affecting the saleable conditions of products and estimated prices at which those products will sell. On an ongoing basis, Global reviews the carrying value of its inventory, measuring number of months on hand and other indications of salability. Global reduces the value of inventory if there are indications that the carrying value is greater than market, resulting in a new lower cost basis for that inventory. Subsequent changes in facts and circumstances do not result in the restoration or increase in that newly established cost basis. Inventories consist of finished product and are stated at the lower of cost, determined using the first-in first-out method, or market. On the Petition Date, Global's inventory, including the inventory in China was valued at approximately $680,000.

25. **Property & Equipment, Intellectual Property.** Property and equipment are stated at cost. Depreciation on property and equipment is calculated on the straight-line basis over the estimated useful lives of the assets. Leasehold improvements are amortized over the shorter of the lease term or their estimated useful life. Maintenance and repairs are expensed as incurred; expenditures that enhance the value of property or extend the useful lives are capitalized. When assets are sold or returned, the cost and related accumulated depreciation are removed from the accounts and the resulting gain or loss is included in income. Global capitalizes certain website

development costs incurred in designing, developing, testing and implementing enhancements to its website. These website development costs are amortized over the enhancement's estimated useful life. In addition to website development costs, capitalized software includes internally developed software to be sold, licensed or leased. Amortization of capitalized internally developed software is computed as the greater of: (a) the amount determined by the ratio of the product's current revenue to its total expected future revenue or (b) the straight-line method over the product's estimated useful life, generally three years. Global has used the straight-line method to amortize such capitalized costs. As of Global's September 30, 2016 10-Q filing, Global's consolidated Property and Equipment was valued at $117,358. On the Petition Date, the value of Global's Intellectual Property is unknown.

## IV. REVENUE GENERATION

26.       Revenue is derived from eyewear sales, lens sales and technology sales, and is recorded in the period in which the goods are delivered or services are rendered and when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the sales price to the customer is fixed or determinable, and collection is reasonably assured. Global reduces revenue for estimated discounts, sales incentives, estimated customer returns, and other allowances and presents revenue, net of taxes collected from customers and remitted to governmental authorities.

27.       **Technology Sales.** Revenue and related costs of sales of Global's laser tracing system, *eyeX3*, are recognized when risk of loss and title passes, which is generally at the time of shipment. This product was discontinued in 2015 due to poor market demand.

28.       **Term Licensing Revenue.** Global applies the provisions of ASC Subtopic 985-605, "Software Revenue Recognition", to all transactions involving the licensing of software products. Term license revenue includes arrangements where Global's customers receive license

rights to use its software along with bundled maintenance and support services for the term of the contract. The majority of Global's contracts provide customers with the right to use one or more products up to a specific license capacity. Certain of Global's license agreements stipulate that customers can exceed pre-determined base capacity levels, in which case additional fees are specified in the license agreement. Term license revenue is recognized ratably over the term of the license contract.

## V. NECESSITY FOR BANKRUPTCY FILING

29.     As of September 30, 2016, Global had cash of $130,413. As reflected in the September 30, 2016 condensed consolidated financial statements, Global had a net loss of $4,735,782 and net cash and cash equivalents used in operations of approximately $3.01 million for the nine month period ended September 30, 2016. Global has a working capital deficit of approximately $23 million and stockholders' deficit of approximately $29 million as of September 30, 2016. Those factors raised substantial doubt about Global's ability to continue as a going concern.

30.     Historically, Global has been dependent upon its ability to raise sufficient capital to continue its product and business development efforts. The ability of Global to continue as a going concern was dependent upon its ability to raise additional capital, increase its revenue and develop its technologies to the point of revenue recognition.

31.     Global's primary source of operating funds since inception has been cash proceeds from issuance of notes payable. As of September 30, 2016, Global intended to continue to raise additional capital through private placements of debt and equity securities, but there was no assurance that those funds would be available on terms acceptable to Global, or would be sufficient to enable Global to fully complete its development activities or sustain operations. Global raised approximately $3.2 million, net of repayments and debt issuance costs, in the nine month period

ended September 30, 2016, through the issuance of convertible debentures (as described in Note 5 to its consolidated financial statements). Subsequent to September 30, 2016 Global raised approximately $385,000 through the issuance of convertible debentures (as described in Note 13 to its consolidated financial statements). However, there was no assurance that Global would be successful in raising additional funds.

32.     On or about November 17, 2016, Hillair Capital Investments, L.P. ("Hillair") Global's largest creditor who had been purchasing Global's secured convertible debentures declined to further purchase any more debentures from Global. Without Hillair's acquisition and purchase of such secured convertible debentures, Global found itself without the funds necessary to operate for any significant period of time, much less plan the continued business development of its products in 2017.

33.     Immediately thereafter, Global sought financing alternatives with various parties, including seeking loans from the following parties: (i) noteholders; (ii) founders; and (iii) Greenville Strategic Royalty Group. However, because Global's and its wholly owned subsidiaries' assets were fully encumbered and the secured debt far exceeded the value of the assets owned by Global and its wholly owned subsidiaries, Global was unable to raise any further funds from any other parties.

34.     The foregoing highlights the respective backgrounds of the Debtors and their businesses as well as the facts and circumstances that gave rise to the necessity for the filing of these Chapter 11 bankruptcy cases. The PFO Companies have arranged and negotiated, subject to Court approval, for the use of debtor-in-possession financing through Hillair and intend to utilize the 363 sale process to liquidate their assets."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 30, 2017

Matt Cevasco
Chief Executive Officer
PFO Global, Inc.